May I please report, Brian Deaton on behalf of ARCELORMITTAL STAINLESS BELGIUM A&V, now known as APROM STAINLESS BELGIUM A&V. The question in this case relates to the proper manner in which commerce may interpret its anti-dumping and countervailing duty orders. On one hand, commerce argues that close is good enough, that the products here are similar enough to the products covered by the orders that they could justify adding 13 words to those orders to capture those products. They call these 13 words omitted technical language. It's our contention, however, that the orders must be read according to their plain terms, that the boundaries of those orders establish what is covered. In this case, the orders cover only certain stainless steel plate and coils, and that certain stainless sheet plate and coils is 4.75 millimeters or more in thickness. But even if that's true, is there a certain amount of slop or flex in what is understood to be 4.75 millimeters in the industry? Nobody's going to go around with a micrometer and go through the whole thing, are they? They do. In fact, they do. Companies have to have mill certifications that they attach. But the exactness, if it's 4.74, wouldn't affect the buyer's interest in the product. The buyer would still accept the product. Yeah. However, for classic... Why can't commerce take the same view? Commerce could have taken the same view had it included the industry standard within the language of the order. In this case, it didn't include that industry standard in the language of the order. It simply referred to the minimum thickness as 4.75 millimeters or more in thickness. But the only way we can ever determine the meaning of language is in its context. And so, doesn't the trade usage have to be part of the context here? Kind of what people see when they see 4.75, what do they understand when they see that? You're right, Your Honor. Language must be considered within context. There's no testimony here, there's no evidence here as to what somebody in the SSPC industry would think when they saw 4.75 millimeters or more in thickness. The industry does operate on actual bases. That has to be the case, because there are certain actual thicknesses below which, even under the government's theory, this product would no longer be termed SSPC. So therefore, the industry does understand and uses actual bases. But beyond just the SSPC context, which we claim is consistent with our view, you have other contexts as well. You have customs contexts. After all, anti-dumping orders are written for importers. Customs law is very clear that dimensions are based on actual dimensions. There's almost no question on this. And there are tens of thousands of customs classifications that use dimensions. None of those dimensions specify actual or nominal, yet there aren't hundreds of cases before this court challenging each of those customs classifications. It seems to me that what Commerce did here is just to follow our precedent and look to the words of the order to see what those words cover, what the order covers, or reasonably could be interpreted to cover. And isn't that quite proper? It's definitely proper to look to the language of the order, and that's what we urge this court to do. But it's not only the language, but it's what the words cover and might reasonably be interpreted to cover, which brings in the question of the context that Chief Judge Rader brought up. And here Commerce came to the conclusion that, well, when you say 4.75, you could mean actual or you could mean nominal. Well, Your Honor, there's no suggestion, though, that the term 4.75 millimeters thickness without the word or modification nominal means anything other than actual measurements. You could make the argument that they apparently didn't recognize this nominal issue until they got into, what is it, the fifth review? Isn't it the fifth review that finally came in this new interpretation? Well, Commerce knew of this issue, though, even in the time of the investigation. And indeed, in the second and fourth review, this issue was sort of raised in verification, and Commerce found that product that fell below an actual 4.75 was not covered by the order. That's my point. Isn't that an appropriate answer to... Oh, that sure is. That's Lynn's question. But beyond that, you also have to look at the broader sphere of Commerce's orders. Commerce never uses the term actual thickness. In its orders, it only uses the term nominal thickness. And Commerce has, in many instances, used tolerance ranges in orders. How do you see our deferral precedent affecting this case? I think it affects it in two ways. First is Commerce is bound by the language of the order. Here, it wishes that the order had read 4.75 millimeters or more in nominal thickness. Nominal thickness is a term of art. It should have been there. It's not there. Therefore, Commerce is bound by the plain language of the orders. In that case, the question was over whether certain products maintained a rectangular cross-section. In footnote 13 of this Court's decision, this Court held Commerce to the strict mathematical definition of the term rectangular. Indeed, in its brief, Commerce argued that it was generally recognized that this product fell within the language of the order to capture things that it wished it had included within the original scope of the order. Beyond that, though, in going back to Chief Judge Rader's question about the context here, if you step back and look at the actual context of the industry, 4.75 millimeters or more thickness isn't even an industry standard. Commerce has no response to that other than to say it doesn't really matter whether it was 4.75 or 4.76, but it's simply not credible to say that the word 4.75 has no industry meaning, yet the word thickness does. In other words, that one word can have an industry specification, and yet one word three words later in the order does. That's simply not credible. The reason for that is because this order was never intended to be based on the HTS definition of what plate was. How do we know that? We know that for two reasons. First, or actually just one reason, we know that because during the investigation, petitioners put forth both the AISI definition and the HTS definition of plate. The AISI definition was based on English units and was at 1.1875 millimeters. The HTS definition, they told us, was based on 4.75 millimeters which did Commerce choose? The 4.75. To this day, petitioners nor Commerce have ever found an industry standard that's based on 4.76 millimeters. Does carbon steel tell us anything about that issue? It sure does. In carbon steel, the petitioners raise the exact same question. Unlike this case where it was 10 years after the fact, in carbon steel, it was during the actual investigation, and petitioners halfway through the investigation said, you know what? There are all these nominal products out there that we'd like to capture. They compete with our products. They're within the tolerance ranges. Why don't you just go ahead and cover those products by these orders? Because of the clarity of the order, however, Commerce said, no, we're not going to. That decision was rendered four months before the investigation in this case was initiated. In terms of context, that's the trade and commerce bar that would have established what these terms meant. Yet Commerce has completely ignored that precedent. So in a case that's built on context, Commerce chooses to look at one context, and one context that's at best murky, and ignore every other context. It created this claim of ambiguity. It's never addressed carbon plate in a way that actually gives credence to the decision. Even judging below did not fly Commerce's argument that carbon steel was distinguishable on the basis that Commerce articulated in its remand determination. So the question, for your honors, is really, can Commerce add words to the orders? Commerce sets this as a dichotomy between adding the word actual and nominal. We posit that, first of all, the English language does not require that the word actual be there. Of course it's actual, unless it's otherwise stated. That's just how humans operate. But beyond that, it's not just an addition of one word that Commerce is proposing here. They're proposing to add 13 words, both the word nominal, and then reference the standards that were never before the agency, and never considered when the scope language was adopted. If it may please the Court, I'd like to reserve the rest of my time for rebuttal. Thank you, Mr. Dayton. Ms. McCarthy? Good morning. Can I please the Court? The judgment is alleged to be affirmed because the trial court correctly sustained Commerce's threshold finding of ambiguity in the case. And to be clear, the only issue on appeal is the threshold finding of ambiguity. ASB just made numerous challenges that go to the merits of Commerce's determination under K-1 of its regulations. Are you arguing that it's not necessary to find an ambiguity, or that there clearly was an ambiguity? What is your position on the ambiguity? Our position is that Commerce, that the trial court correctly sustained Commerce's finding of ambiguity, which is found at page, Joint Appendix A-30, Commerce's finding of ambiguity. And that's the sole issue on appeal. ASB has weighed... What is ambiguous about 4.75 thickness? The fact that there's absence, as Commerce explained at page A-30, there's an absence of a modifier. Commerce was cognizant... That doesn't make it ambiguous. That makes it clear. Commerce was cognizant that industry treated this product on a nominal basis, much like softwood lumber. But my problem with your case is, is that for almost 10 years, there was no ambiguity here. And then suddenly in your review, wasn't it the fifth review? Well, Your Honor, at the page... Am I correct? It wasn't until the fifth review that the ambiguity suddenly popped up? Well, I'm not sure what you're... To be clear, beginning on, and this is at page A-26 of the Joint Appendix, on October 8th, 1998, before the order it issued here, there was... Commerce clarified the reporting methodology, and there was a reference to, please report your product on a nominal basis. So clearly, throughout the Administrator Review, and this order was in place for eight years before the scope inquiry in this case, there was repeated reporting on a nominal basis of this product. As Commerce has conceded, and as the trial court found below, there was inconsistent practice, which is precisely why Commerce could not stop at K-1. Because of the inconsistent practice, the K-1 analysis alone was not dispositive of the scope of this issue. That required Commerce to go to K-2. There is no challenge here on the merit of Commerce's K-2 analysis, which places this product really within the scope of the order. That has been waived, notwithstanding what ASB says it, but note three of its reply brief. The only issue on appeal here is the threshold issue of ambiguity. And as this court held a novice appeal, that is... Ms. McCarthy, you drafted the ambiguity. If there's an ambiguity, my Latin is not very good, but I think we call that contra pro forensum. Isn't there some sense here that if there's an ambiguity, and the plagiarist suggests 4.75 doesn't sound very ambiguous, didn't you make the ambiguity? Your Honor, first of all, contra pro forensum would apply in a contractual situation where the party has an interest. Commerce is an adjudicative agency here. It doesn't have a dog in the punch. It doesn't have any vested interest in having this product in or outside the scope. So I'm not sure that the principles of contra pro forensum would apply in this situation. If Commerce doesn't have an interest in it one way or the other, why are you all fighting over this issue? Well, because Commerce drafts the scope, and Commerce is entitled to quite a bit of deference under this court's precedence in interpreting that scope. And Commerce made a determination here, and we think it's correct, and we're defending the merits of Commerce's determination. But Commerce wasn't... This wasn't Commerce's idea to decide whether this product was in and out of the scope. It doesn't have a vested interest. But you could have made it very clear that by putting in the single word nominal, or by putting in a reference to a standard or a trade usage, this would have all gone away, right? You're absolutely correct, Your Honor. Absolutely correct. And you're representing the government. I'm representing the government. The government wrote the initial draft. If Commerce had conceded that, it could have done a better job, and it has since done more precise in using nominal. Were they entitled to rely on the course of proceedings up until the point where this scope issue came up? Your Honor, if we could just step back. If Commerce were perfect, there would never be any need for a K-1 or K-2 analysis. Those are predicated on I regret to concede that point, Your Honor. The government is not perfect. I'm sorry. I can't hear that. The whole purpose for a K-1 and K-2 analysis is to treat the circumstances of ambiguity. Just to be clear, the trial court reports are a three-step process below, and Commerce has really two steps in its regulation. The third step really came in after this court's decision in Deferco, where Commerce, we were overturned in that case because we referred to K-1 factors, which included the petition. And this court said, no, no, no, you need to start. As I read Deferco, the order has to be subject to interpretation. Now, I don't know what that means other than it means to me, subject to interpretation means it's not clear on its face. It's ambiguous. Exactly. So we sort of run around the circle on that one. So at some point, if it's not clear on its face, it's subject to interpretation, which means it's ambiguous. Right. What's not clear about 4.75 thickness? The fact under Deferco, it's subject to more than one reasonable interpretation. In Deferco, this case is fundamentally different from Deferco. In Deferco, the way the order is written in that case, there was no conceivable way that the could be found within the scope of the order because it applied only to non-rectangular tiles after a process, after the performance of a process. There was no concession that those non-rectangular patterns existed before the process. So there was just no way, and the government conceded that there was no way that you could use the plain language of the order in Deferco to have that product within scope. Commerce had resorted to the petition in that under K1 and had imported the petition language to essentially modify the scope, and the court shut that down. The court said, no, you can't do that. That's what led to this sort of first step that we have now, which is look at the order, see if it's subject to more than one reasonable interpretation. As Commerce explained at page 830 of its remand determination to the 830 of the joint appendix, this is why it's subject to more than one reasonable interpretation. It then went through the K1 analysis. It found that there was inconsistent treatment, which meant that it was not dispositive. Then it proceeded to the K2. K1 analysis and K2 analysis are not being challenged in this appeal. In fact, the resort to the custom HDS classifications is somewhat ironic because there's actually plain language in the scope of the order that says that those are just for convenience, yet ASB is asking the court to and look to extrinsic evidence to find that the language is clear in its face. What's at stake in this argument? What's at stake? Commerce has an enormous amount of discretion. No, but what's at stake in terms of real stake? Is there money involved in this? Well, presumably ASB feels that there's a financial harm to it to having its product within the scope of the order and subject to duties, countervailing and anti-dumping duties. Commerce doesn't have a view on that? Well, Commerce, again, is an adjudicatory agency. It doesn't have a dog in this hunt. It just calls it like it sees it, and it was asked to determine whether it was within or without the scope, and it determined that it was within, applying its regulation, applying its criteria and its regulation. And again, I emphasize, K1 and K2 analysis, the merits of the inquiry are not subject to the appeal. The only issue here is the threshold finding of ambiguity, and this Court held very clearly in Novice Deal at 284 F3rd at 1272, that there's a quote, low threshold needed to show that Commerce is justifiably found in ambiguity. That low threshold is satisfied here. Are there any allegations that ASB or anyone is slightly altering products to change the classification? I'm not aware of those allegations. I don't believe that there are, Your Honor. We respectfully request that the judgment be referred to. Thank you, Ms. McCartney. Mr. Beckington. Good morning, Your Honors. May it please the Court. I would like to start off by saying that I believe the industry does, in fact, operate on a nominal basis, and there are two basic reasons why that's true. First, it is not physically possible for any mill in the entire world, either in Belgium or in the United States or anywhere else, to take a roll of stainless steel plate and coils that's hundreds of feet long, and consistently, throughout every point of that very lengthy piece of coil, hit exactly 4.75 millimeters or any other exact... Nominal. They've argued about nominal. Nominal means by name, but it implies some range of some kind. Is there a known industry range? There are different ranges, but the one that is, in the United States, at least most commonly adhered to or recognized or followed is the ASTM standard, 480, which changes over time, interestingly, as technology advances. This was the earlier argument discussing in a different context this morning. And what is that range? It varies, Your Honor, dependent upon exactly what is being sold and what is being purchased. You have to look at the ASTM chart to find out exactly. The answer will differ depending... Now we heard from Mr. Dayton that he thought it was the HTS standard. No, that's a customs law standard. Back to the earlier part in the original investigation of this case, HTS was chosen by petitioners, of whom, of which I represent one, Allegheny Ludlum, because it was, as Ms. McCarthy just said, for convenience and customs purposes. At the port of entry, when the merchandise comes in, it's got to be clarified. And so that's an easy way to do it. People are not going to say in this industry, well, three-sixteenths of an inch is .1875 inches or 4.7625 millimeters, which are actually the precise measurements involved. People typically are going to say 4.75. That's the cutoff in customs language in the Harmonized Terror Schedule. That was used more for convenience than anything else. And that's what Congress has said in its remand redetermination and pretty much all the way through. Is 4.75 a standard number in the system? Mr. Dayton will probably disparage what I'm about to say as he has below, but essentially, yes. That is... Essentially, yes. That is what we said in the original record. Is that a nominal essentially? How do they know what fits and what doesn't fit if you're going to tell us essentially yes? And they're going to say, well, but essentially no. And are we going to end up measuring everything that comes in? No, Your Honor. I didn't mean to seem loose here. We said, as Petitioner's Counsel in the original investigation, I believe it was an 8 May 1998 letter, that 4.75 is our understanding as the domestic U.S. industry millimeters is the typical normal way to refer to the distinction between coil plate and a sheet and strip, which is the next thinner down gauged product. So again, this is the standard industry approach. It is so well understood that it is done on a nominal basis because nobody can hit as a producer, the exact gauge thickness, whatever it is in the given instance, that you have to have nominal. And that's what the ASTM does. The ASTM is essentially the industry as a whole. Producers, purchasers, distributors, buyers, sellers saying, here's how we are going to operate basically in this industry. I would also... The problem, of course, is if it was that crystal clear, we would have seen that in the scope work and in the order itself. Well, there was... Or in one of the many reviews that occurred before we got here. Well, you don't even have to go to any of the reviews, Your Honor. You can go to the original investigation and there was a letter, there were actually multiple letters in the various sundry sheet and strip and plate coil cases where the department said, and I'll quote, this is at the joint appendix of A128. This is Commerce saying to the different respondents, including the Belgian Council at the time, for purposes of ensuring that all appropriate products have been included by your client, please ensure that all sales of products for which the nominal thickness is greater than or equal to 4.75 millimeters have been included in your client's questionnaire response. That was Commerce writing to the Belgian Council. Subsequently, the Belgian Council responded, and this is at page A131, the department has now redefined the scope to include material with a nominal thickness of 4.75 millimeters or greater, but is requiring respondents to report sales on an actual thickness basis. There is no logical basis for defining the scope of the investigation based upon nominal thickness while requiring respondents to report sales on an actual thickness basis. If the department wishes to consider changing the scope of the proceeding, it should do so in an orderly fashion. In fact, the department had, by the letter from October 898, changed or clarified that during the course of the investigation, the scope was to be on the nominal basis. Thank you, Mr. Beckington. Mr. Dayton, you have almost five minutes. Mr. Dayton, this whole thing is a self-reporting issue, isn't it? I mean, doesn't this turn on what you have to, what your Belgian company has to report to Commerce? No, this extends beyond that. That's what it began with in the investigation. To ensure that we reported everything, that we weren't cutting corners or anything, Commerce asked for more than what was covered by the orders. What Commerce did in the scope review, though, is now define the scope to include nominal merchandise, so that products that are actually lower than 4.75 millimeters in thickness are covered by the orders. How much lower? It could be as low as 4.51 millimeters. 4.51? That's the lowest actual thickness now that the orders cover. It's about a 0.25 millimeter tolerance range. So, the lower end. Now, when you determine what to report, do you report only actual thicknesses of 4.75 and above, but what do you mean by actual thickness? Because, as you indicated to begin with, there's always a little slop in those numbers in terms of the actual sheet metal. Now, what do you report? Well, for now, for purposes of reporting things... What is it you want to report? Well, we want to report what is the industry standard for measuring what an actual thickness of a product is. The ASTM actually defines how you measure the actual thickness. Take a coil, and you go, I think it's three quarters of an inch from the end, and you measure using a micrometer at that point, and what that actual thickness is, is what the actual thickness of the product is. And if it came out 4.74, what is it? Well, according to our view, it's no longer covered by the order. It's now a product called sheet and strip, and that's covered by a different order. Commerce, however, would like to include that as part of this order. Well, when you say 4.74 is strip, you've got a coil that could measure any... It's actual thickness is 4.75 on the paper, but it's not really 4.75. There's going to be a certain amount of flex. How do you deal with that? I'm confused. Well, going back to the ASTM standard, you take a ruler, and you go in three quarters from the end of the coil. Coils, of course, you don't unroll the entire coil. You go to the end, you go three quarters of an inch in or so, and you measure at that point. And you measure only one point. Right. Isn't that something you could manipulate? So you roll those ends just a little bit tight so that you can get just under 4.75? To the best of my knowledge, you can't manipulate that, but that's what importers have been living with for the last 200 years under the HTS, because the HTS is based on an actual system. The system is administrable. It's used by the HTS. It's used by customs. Customs knows how to do it. Customs knows how to prevent circumvention like that. And under HTS, if it comes in at 4.74, it's sheet and not plate? Exactly. And that's the standard I think Mr. Beckington said was the one that they referenced. Why isn't that the trade usage instead of what we're told is the trade usage? Precisely, Your Honor. Why has commerce gone to a standard that was never put before it, the ASTM, instead of looking to the HTS? I mean, this is a case about context, then get the context right. What's the answer to that question? Why is commerce doing it? What's at stake? What's at stake is that if they use the HTS, it's on an actual basis this product is out. Yeah, but so what? So what? I think for commerce, this is a question of if it looks like a duck, quacks like a duck, it should be a duck and we should be able to capture it. There's nothing wrong with that. Which is, except for this court's decision in DeFuerco, which says, look, orders cut across product classes. They kind of arbitrarily set boundaries. And those boundaries have to be respected. For example, commerce is using the industry standard now for thickness, but it's not using the industry standard for surface treatment. Instead, the order's indifferent to surface treatment. So the order cuts across what are different product classes as recognized by the industry. Why should they use one industry standard somewhere in the order and then no industry standard elsewhere in the order? It's arbitrary. During the investigation and the first four reviews, you presumably were complying with the rulings. We reported on that basis. You reported on the basis of what you thought was actual thickness. Is that right? We reported, I'm going into my rebuttal if I may, or my time's expired, if I may. Finish the question, finish your answer. Since the investigation, we've reported, we've given commerce all of our data, including products that have only nominal thickness. At least in the second and fourth reviews, and maybe in other cases as well, commerce has only calculated the duty margin on the basis of products with an actual thickness of 4.75 millimeters or more. And now they want to calculate it on the basis of nominal. Now they want to calculate it, and they also want to impose duties on products with only a nominal thickness of 4.75 millimeters or more in thickness. Okay. Thank you. Okay, thank you.